EDITH PERLSTEIN, ADMX.
*vs.*
WESTPORT SANITARIUM CO.

Superior Court     Fairfield County     File No. 62484

MEMORANDUM FILED SEPTEMBER 3, 1942.

*Pullman & Comley,* of Bridgeport, for the Plaintiff.

*Cummings & Lockwood,* of Stamford, for the Defendant.

Memorandum of decision on demurrer.

O'SULLIVAN, J. The complaint is in three counts, to each of which, as well as to the prayer for relief, a demurrer has been addressed. The following allegations are common to all counts; the defendant operates a sanitarium in the Town of Westport for the treatment of persons suffering from mental disorders. On June 17, 1939, Leo Perlstein, who was afflicted by suicidal impulses, entered the sanitarium as a patient. He was assigned to a room from which certain furnishings had not been removed. On the following day, making use of some of these articles, he hanged himself. About a year and ten months later, the plaintiff qualified as administratrix on his estate.

In addition to the foregoing, the following appears: In the first count it is alleged that Perlstein, acting through his wife, had entered into an agreement with the defendant whereby the latter undertook, for compensation, to safeguard him and prevent his carrying out any insane desire for self-destruction, which agreement was breached; in the second count, it is alleged that the defendant's negligence in failing to keep Perlstein under proper supervision was the cause of his death; and in the third, that Perlstein was induced to become a patient by reason of certain representations made by the defendant to the effect that it was thoroughly equipped to insure his safety from acts of his own violence and that these representations were false in fact and known to be so by the defendant.

Thus, the plaintiff is seeking to recover damages for the death of her intestate on the theory of (1) breach of contract, (2) negligence, and (3) fraudulent representations. The demurrer to the first count is short and it will do no harm to

spread it out so that we can see it. The defendant demurs, because:

"1. The alleged cause of action is within the provisions of 1430e of the General Statutes [Supp. 1939] and was not brought within the time limited, namely one year from the neglect or fault complained of.

"2. Said action is within the provisions of section 1680c of the General Statutes [Supp. 1935] and was not brought within one year from the date of the act or omission complained of.

"3. No action lies at common law for damages resulting from death due to breach of contract.

"4. An action for damages resulting from death due to breach of contract does not survive.

"5. It fails to state a cause of action."

The fifth ground may be ignored because of its generality. As to the third and fourth, they allege legal principles out of harmony with those settled by a recent case which holds that an action for death due to a breach of contract survives and that damages for the death are recoverable. *Giambozi vs. Peters,* 127 Conn. 380. The cited case overruled, if *Porpora vs. New Haven,* 122 Conn. 80, had not already done so, the law as formerly stated in *Burkhardt vs. Armour & Co.,* 115 Conn. 249.

The *Porpora* case, which was the precursor of *Giambozi vs. Peters,* is an iconoclastic decision, destroying, as it does, a network of precedents, and leaving high, dry and stranded the legal philosophy underlying the purpose and effect of our survival and death statutes, as enunciated so clearly in *Kling vs. Torello,* 87 Conn. 301.

No legal principles have been more thoroughly accepted than that at common law (1) one's death, whether traceable to an actionable wrong or to natural causes, abates a pending action for personal injuries, or, if suit therefore has not been instituted, bars a representative from enforcing the right his decedent had possessed during life to recover damages from the wrongdoer, and that (2) the, destruction of human life is not an actionable injury. *Broughel vs. Southern New England Telephone Co.,* 72 Conn. 617; *Connecticut Mutual Life Ins. Co. vs. New York & New Haven R.R. Co.,* 25 id. 265.

These rules, which not infrequently are thought of as a single, composite legal principle, are, in truth, separate and distinct and a failure to appreciate this fact may lead to confused thinking. Of course, the rules were too barbaric to remain unchallenged by society. At least as far back as 1672, the Colony of Connecticut had provided for the recovery of the fixed sum of one hundred pounds for death due to a defective highway or bridge. Laws of Connecticut, Compilation of 1672. This was in the nature of a penalty, requiring no survival statute to enforce it. And obviously so, for the right of recovery was not a right the decedent had enjoyed. The statute created its own cause of action. The provision for this penalty remained in force until repealed by chapter 49 of the Public Acts of 1848. During the same session, but at an earlier date, the General Assembly enacted the first survival statute concerning post-mortem rights flowing from personal injuries. It read:

"Sec. 1.... No action to recover damages for injury to the person, reputation or property of the plaintiff, or to the person of his wife, child or servant, shall abate by reason of his death, but his executor or administrator may enter and prosecute the same, in the same manner as is now by law provided in regard to other actions.

"Sec. 2. Actions for injury to the person, whether the same do or do not result in death, actions for injury to the reputation, or actions for injury to the property, real or personal, and actions to recover damages for injury to the person of the wife, child or servant, of any deceased person, shall survive to his executor or administrator, *provided* the cause of action shall not have arisen more than one year before the death of the deceased.

"Sec. 3. Nothing herein contained shall affect any action now pending, or be applicable to any cause of action now existing." (Pub. Acts [1848] chap. 5.)

The foregoing statute, amended in phraseology from time to time, and sometimes segregated by itself and sometimes joined by a section incorporating the so-called death statute (notably Pub. Acts [1903] chap. 193), has remained in force until today when it appears as section 1432e of the 1939 Supplement to the General Statutes.

For three years after its passage in 1848, we had no death

statute. In 1851, the Assembly passed an act providing that if any person should lose his life in consequence of the failure of a railroad company to cause a whistle to be blown or a bell sounded when a locomotive was approaching a grade crossing, the company should forfeit and pay $1,000 to designated persons. (Pub. Acts [1851] chap. 43, §2.) This statute continued in effect until 1875, when it was amended by striking out the specific sum, and by substituting a provision that a railroad company should pay *all* damages which might accrue to any person as a result of the failure of the engineer to give a warning by bell or whistle when nearing a grade crossing. (Gen. Stat. [1875] tit. 17, chap. 2, part 9, §73, p. 331.)

In 1853, another act was passed providing that a railroad company should be liable to pay not less than $1,000 nor more than $5,000 to certain beneficiaries for negligently causing the death of a passenger or any other person. (Pub. Acts. [1853] chap. 74, §8.)

Another act to which reference should be made, was passed in 1869, which provided for the recovery of damages, not to exceed $5,000, from a railroad company whose failure to fence its right of way caused death. (Pub. Acts [1869] chap. 48.)

A summary of the various matters referred to above is this: So far as a respectable research discloses, there were four instances prior to 1877 when the Legislature passed acts which specifically mentioned money that might be recovered for death, either as damages or as a penalty. These instances were:

(1) The statute of 1672, allowing a penalty of one hundred pounds for death resulting from a defective highway or bridge.

(2) The act of 1851 (chap. 43), authorizing the forfeiture of $1,000 from a railroad company for death caused by the failure of those in charge of a locomotive to give a warning, by bell or whistle, of its approach to a grade crossing.

(3) The act of 1853 (chap. 74), providing that a railroad company should be liable in damages for an amount not less than $1,000 nor more than $5,000 for negligently causing the death of a passenger or any other person.

(4) The act of 1869 (chap. 48), providing that a railroad company should be liable in damages for an amount not in excess of $5,000 for the death of any person injured through the failure of the company to fence its right of way when on or adjacent to a highway.

Item (1) was repealed in 1848; item (2), in 1875; and items (3) and (4), in 1877. (Pub. Acts [1877] chap. 78.) This last mentioned act, in addition to repealing the statutes referred to, provided that "in all actions by an executor or administrator for injuries resulting in death from negligence", just damages not exceeding $5,000 might be recovered from the party legally at fault. By this new enactment, the Assembly changed its tactics. It no longer singled out railroad companies; the embrasive language of the act of 1877 brought within its scope everyone legally at fault because of negligent conduct.

The *Porpora* case holds that an action for death resulting from the breach of a statutory duty is preserved by virtue of the survival statute, and, inferentially at least, that the same statute authorizes a recovery of damages for the death. The latter conclusion is definitely reached in the *Giambozi* case. Fundamentally, each of these two cases called for a construction of statutes. The intention of the Legislature is the guide for such an effort and must be ascertained from the language itself if that is plain; but when it is doubtful, the true meaning is to be gathered by considering the act in the light of all its provisions, the object sought to be accomplished and the evil to be eliminated, pre-existing legislation upon the same subject and other relevant circumstances. In applying this test, the Supreme Court found what it deemed to be the legislative intent, and in a sweeping decision, annihilated many concepts of the law long entertained by the bar and, I am sure, by the trial bench. Although it takes me beyond the line necessary to rule on the demurrer, I venture to express what some of these concepts were. I begin by stating the conclusion that the survival statute is nothing more than what its name implies and does not effectuate any result other than to permit the representative to recover such damages as his decedent could have recovered, had he lived. In other words, it abolishes only the first of the two common-law rules stated some paragraphs back, leaving for additional legislative action the abolition of the second rule.

This traditional view of the bar and trial bench was based on various grounds which may not be inappropriately stated at this point. In the first place, with the sole exception of the years between 1848 and 1851, there has always been in force in Connecticut, since at least 1672, one or more statutes com-

monly called death statutes. From 1672 until 1848, a matter of 176 years, recovery for death was extremely limited. In fact, it was not predicated upon a true death statute, as that expression is ordinarily understood, for the law provided merely for the recovery of a fixed penalty from those responsible for defective highways and bridges. No particular significance should be assigned to this statute save as it indicates that for a century and three-quarters but one situation could arise whereby a wrongdoer could be compelled to pay a definite sum of money to a beneficiary because of the occurrence of death.

In the second place, between the years 1848 and 1851, while the newly enacted survival statute was in operation but no death statute was on the books (the 1672 statute, it will be recalled, having been repealed in 1848), no cases are reported wherein representatives sought damages for death under the survival statute. It was not until the death statute of 1853 was passed that one finds cases of this sort. This may or may not be expressive. It may have been merely a coincidence.

In the third place, the only death statutes enacted from the passage of the survival statute of 1848 until 1877 dealt with and affected railroad companies. This course of legislative conduct has always been deemed a cogent argument against such an interpretation of the intention of the General Assembly and of the effect of the survival statute as that adopted by the *Porpora* case.

The years from 1840 to 1850 are widely known as those of the great railroad era. To that decade many of the large transportation systems trace their birth, an event not hailed with universal acclaim. Indeed, in the early days, the sailing was far from smooth. Considerable opposition, some of which was quite influential, sought to place innumerable obstacles in the path of growth. This attitude is reflected in some of the proceedings before the General Assembly. 4 *Osborn, History of Connecticut,* p. 478. As one runs through the pages of the public acts from 1840 on, he is bound to be impressed by the many acts devoted to this new creation of science. In chapter after chapter, they were told to do this and that and not to do that and this. I can recall no other subject of regulatory legislation that compares with the scope and constancy of that devoted to the railroads during this early period of their existence.

If, as the *Porpora* case holds, the survival statute of 1848 or its amended descendant creates a right to recover damages for death, and if the death statute is designed merely to segregate from all the rights brought into existence by the former, certain ones flowing out of special types of wrongs committed by specified classes of persons, a singular phenomenon would have occurred, in that between 1851 and 1877 only railroad companies would have enjoyed the limited liability of the death statute then in effect. In other words, if damages for death were allowable under the survival statute, the recoverable amount, in an action against any person other than a railroad company, would have been unrestricted, for the statute contained no limitation. Against the background of the attitude of the Assembly towards railroads, the legislative intent found in the *Porpora* case would, it seems to me, have been an instance of Utopian unselfishness if that purpose was to grant only to railroads the advantage of a ceilinged liability.

While the act of 1851 authorized the forfeiture by a railroad company of $1,000 for causing death due to a failure of those in charge of a locomotive to give a warning of its approach to a grade crossing, it was couched in language suggestive of a penalty. The first true death statute, that is, one allowing the assessment of damages for death, was that of 1853. It is worthy of note that this latter statute was enacted by the Legislature, which happened to be in session, within a month after the disastrous wrecking of a train which plunged through an open drawbridge at Norwalk on May 6, 1853, resulting in the deaths of many passengers. To the authority which holds that the survival statute allows damages for death, the only justification it can advance for the act of 1853 would appear to be that the legislative purpose was to secure the railroad companies against the unlimited amount of damages for death permitted by the survival statute, or, in other words, that the purpose was to protect the new industry. But is it not more reasonable to believe that the legislative objective was to add to the cause of action for ante mortem sufferings, saved by the survival statute, a newly created right to recover an additional amount for the death itself? If the Assembly believed that from 1848 to 1853, the survival statute authorized the recovery of damages for death, it would, it seems to me, be contrary to the human nature of every legislator to give his approval to a bill extending limited liability, in cases of death, for none-too-popular transportation companies, one of which had within the

month caused the deaths of many at Norwalk, while permitting all others, including himself, to be subjected to unlimited liability for potential acts of negligence resulting in death.

In the fourth place, the traditional concepts as to the law found support in many authorities, on which the *Porpora* case relies, but which on analysis would appear to be in direct conflict with its conclusions. The first case that is reported after the passage of the survival statute was *Soule vs. New York & New Haven R.R. Co.*, 24 Conn. 575. The cause of action arose from events occurring before the passage of the act of 1853. The act of 1851 was in effect but it had no bearing on the case in as much as the accident was not due to the failure of an engineer to sound a warning.

The *Porpora* case cites the *Soule* case, saying of it (p. 86) that "this court sustained an action against a railroad for a death due to its negligence which occurred in 1853, under the provisions of the act of 1848 [the survival statute]." With great deference to the high authority from which this statement emanates, I can find no justification for it. The facts of the *Soule* case were these: A Mr. Gray, on whose estate Soule was acting as administrator, was one of those passengers whose death had occurred in the Norwalk disaster. This was the wreck, it will be recalled, that prompted the Assembly to pass the act of 1853. When the train plunged into the river Gray was not instantly killed, but, for two hours or more before dying, he remained severely "wounded, bruised and injured, and suffered great pain and anguish both of body and mind." The opinion, I submit, does not hold that an action against a railroad company to recover damages for death was maintainable. The case decided only these two points:

(1) that, in the second paragraph of the act of 1848 reading "actions for injury to the person, whether the same do or do not result in death.... shall survive," the word "actions" includes causes of action as well as pending actions, and

(2) that Gray's sufferings and the duration of them were appreciable, and "though probably short, were intense beyond conception, and this is enough to maintain this action."

The court expressly refrained from holding that damages for death should be allowed. As the *Soule* case was later interpreted, "the plaintiff was entitled to enter.... to prosecute it to a judgment which would be compensatory for all that the

intestate [Gray], *while living*, suffered as a consequence of the injuries inflicted." *Kling vs. Torello*, 87 Conn. 301, 303. (Italics added.)

The *Porpora* case also cites *Murphy vs. New York & New Haven R.R. Co.*, 30 Conn. 184, and states (p. 87) that it "came before this court and a recovery by the plaintiff against a railroad for death at a railroad crossing caused by negligence of its servants was sustained....but the significance of the decision to our inquiry lies in the fact that the action was apparently decided, not under the provisions of the railroad law, but under the general statute as to the survival of actions."

Again, with great deference, may I not refer to what the *Murphy* case seems to me to have decided. The single question raised was whether a cause of action was alleged. The defendant urged that there was none because, as the action was case, consequential damages were essential to support it, and such damages were not pleaded, as the decedent suffered instant death. Thus the question was a technical question of pleading. In analyzing the merit of the defendant's claim, the court referred to the survival statute but did so in order to determine whether any injury resulting in instantaneous death fell within its provisions. The conclusion was in the affirmative on the ground that the decedent's right to personal security had been violated, thereby creating in him a cause of action which survived, the death being the source of the consequential damages. While the death statute of 1853 was not mentioned, it must be remembered that it had been in force seven years prior to the accident giving rise to the *Murphy* case.

And this leads me to suggest that from 1848 until after 1877 there are no reported cases of administrators seeking to recover damages for death from any person other than a railroad company. It indeed would be a striking coincidence if, during that period of 29 years, there was not at least one action brought against some wrongdoer other than a railroad company, if the bar of those days, which undoubtedly included many members of the Assembly that had passed the act of 1848, believed that damages for death were recoverable by virtue of the survival statute.

But the case which more than any other established our law as to the purpose and effect of both the survival and death statutes was *Kling vs. Torello*, 87 Conn. 301. "The right of

action which the executor or administrator is permitted to pursue is not one which springs from the death. It is one which comes to the representative by survival....The survival statute operates to transfer to the representative the right of action which the deceased had for his sufferings and disability during life, while the death enlarges his right of recovery by permitting an award of additional damages for the death itself as one of the harmful results of the wrongful act. The court is by the statute, as it was not by the common law, authorized to take that event into consideration." (p. 305.) The *Torello* case has heretofore been accepted as authority for the propositions that the survival statute repeals the common-law rule that abates pending actions for personal injuries and prevents the instituting of those not already brought, while the death statute allows damages for death in those cases, and in only those which fall within its provisions. This follows the law as stated in *Goodsell vs. Hartford & New Haven R.R. Co.*, 33 Conn. 51, 55, wherein, in speaking of the survival statute, the court said: "In 1848 it was enacted that a suit for injury to the person, whether the same do or do not result in death, shall survive to his executor or administrator....If he dies, the same cause of action, that is, *for the same damages*, survives to his executor or administrator."

Likewise in *Budd vs. Meriden Electric R.R. Co.*, 69 Conn. 272, 284, the court noted the great expansion of the law, stating that "the main difference between the section last named, and the statute of 1853, is that the law as it now exists [in 1897] is not limited to injuries inflicted by a railroad company, but includes all injuries resulting in death."

Finally, to many it will seem that to hold that the survival statute permits a recovery for death offends against reason. For example, if, prior to the amendment of the death statute in 1937 to which reference later shall be made, a passenger on a railroad had been killed as the result of the carrier's negligence, his administrator could not have recovered over $10,000 if he brought an action grounded in negligence, while on the same set of facts, but on a different theory, namely, that of breach of contract, his recovery could have been unlimited. Or, if in the *Burkhardt* case, the action for death under the implied warranty was within the survival statute, as the *Porpora* case would have it, and if the person who died was of great affluence, unlimited damages could have been assessed against

the innocent shopkeeper who sold the corned beef, while the liability of the manufacturer, the one truly at fault, would have been limited to $10,000, because, as against it, the action would fall within the death statute. And if suit had not been brought within a year, as provided by the death statute, the latter, who of the two defendants ought to be held liable, would entirely escape while the former could still have been subjected to the possibility of suit for at least three years.

These traditional concepts on which I have commented can be epitomized by saying that the survival statute was intended to save rights but not to create them and that damages for death should be allowed only in those instances permitted by the Legislature. This finds support in (1) the history of the enactment of the statutes; (2) the absence of any reported cases seeking damages for death between 1848 and 1851 when no death statute was in force; (3) the absence of any such cases between 1851 and 1877 except those against railroads; (4) the intention of the Legislature as it may reasonably be gleaned; (5) the interpretation by the court from the Soule case on, concerning the purpose and effect of the statutes; and (6) reason.

But these concepts must now be discarded and though un-convinced of its soundness, I shall, of course, be guided by the Porpora case.

And now as I pause to read over what I have so far written, I am appalled, first, at my own temerity, secondly, at the length to which this memorandum has already gone, and finally, in contemplating what one may think of the Porpora and Giambozi cases is quite immaterial to the question presented by the demurrer. After all, those cases are the law. But in as much as I have taken the time to transcribe my thoughts to writing, I may as well allow them to remain, let us say, as a prophesy of the overruling of the cases, which sooner or later will occur.

The real problem in the instant case is to determine whether the present death statute (Supp. [1939] §1430e) includes actions for breach of contract resulting in death. If it does, the first ground of the demurrer is good; otherwise, bad.

The death statute in effect when the cause of action alleged in the first count arose reads as follows: "*Actions for injuries resulting in death.* In any action surviving to or brought by

an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, such executor or administrator may recover from the party legally at fault for such injuries just damages not exceeding fifteen thousand dollars, provided no action shall be brought to recover such damages but within one year from the neglect or fault complained of."

This act, which was passed by the Assembly in 1937, amended section 5987 of the General Statutes which reads: "*Actions for injuries resulting in death; damages.* In any action surviving to or brought by an executor or administrator for injuries resulting in death, whether instantaneous or otherwise, [*or whether caused by the negligence of the defendant or by his wilful, malicious or felonious act*] such executor or administrator may recover from the party legally at fault for such injuries just damages not exceeding ten thousand dollars, provided no action shall be brought under this section but within one year from the neglect complained of *or from the commission of such wilful, malicious or felonious act. All damages recovered under this section shall be distributed as directed in section 4983.*"

The amendment of 1937 was undoubtedly inspired, at least in major part, by the *Porpora* decision, which had been handed down during the preceding October. *Shaker vs. Shaker*, 9 Conn. Sup. 182, 186. It must be remembered that section 5987 had been in force without change since 1913, and yet within a few months after the *Porpora* case was decided, and at the earliest opportunity for so doing, the Assembly amended the section to its present form. The italicized language covers the phraseological changes, while the words within brackets are those eliminated by the amendment.

If, then, it was prompted to act by the *Porpora* case, it is reasonable to believe that the Legislature was aware of the conclusions found in the following excerpt (p. 95): "It may be that the scope of §5987....is to be limited now to the causes of action specified in it....Whether or not an action for death due to a highway defect falls within §5987, it in any event survives by reason of the provision of §6030 [the survival statute]....In so far as the decision in *Burkhardt vs. Armour & Co.....*is opposed to this conclusion, it must be overruled."

The significant part of this excerpt that must have been in

the· legislative mind is that (1) actions under the statute for failure to maintain a sufficient fence on the side of a bridge are maintainable under the survival statute, and (2) the *Burkhardt* case was disapproved, in part. This latter case (115 Conn. 249) had held, so far as is pertinent to this inquiry, that damages for the death were properly excluded from the recovery allowed against the defendant Tea Company for the breach of implied warranty.

The deletions from section 5987 are of vital significance. In the first place they throw under the control of section 1430e "any action....for injuries resulting in death" as long as it is an action that survives. This is very broad language whose extent is indicated by the addition of the words "or, fault", found in the amendment after the word "neglect," Ordinarily fault is synonymous with neglect. But it should not be deemed so under the circumstances, for so to hold would attribute to the Assembly the wasted effort of adding a useless alternative, not at all essential to carry out its intent. As employed in the amendment, "fault" means a failure to do that which ought to have been done, or the doing of that which should not have been done; a wrongful act or default; a dereliction of duty. *Webster's Dict.*

When a statute is amended and re-enacted in amended form, the presumption is that this was done in the light of the judicial construction that the prior enactment had received by the court of last resort of- the State. *Stamford vs. Stamford,* 107 Conn. 596, 606. When changes have been introduced by amendment it is not to be assumed that they are without design. 2 *Lewis' Sutherland on Statutory Construction* (2d ed.) §§401, 403.

Considering that the *Porpora* case was responsible for the amendment of 1937, and the phraseology used by the Assembly, I hold that section 1430e is now broad enough to include actions based on breach of contract resulting in death, as well as those grounded in tort.

In view of this ruling, the defendant has the right to raise by demurrer the question of the tardiness of the action, rather than by pleading it in its answer. The year's limitation of time within which suit must be brought is a condition of the right and not a limitation on the remedy. *Hartford and Connecticut Western R.R. Co. vs. Montague,* 72 Conn. 687, 692;

*Radezky vs. Sargent & Co.,* 77 id. 110, 114; *Korb vs. Bridge-port Gas Light Co.,* 91 id. 395, 397.

The first ground is sound and requires the sustaining of the demurrer to the first count. This conclusion makes unneces-sary a discussion of the second ground.

The second count is based on negligence. As damages for death due to negligence is governed, as it always has been since 1853, by the death statute, the limitation of the time therein provided must control. That limitation is one year, "from the neglect complained of." As more than a year elapsed between the neglect and the institution of the action, the statute applies. The demurrer to the second count is sustained on the first ground alleged.

The third count is based on fraudulent representations. Such a cause of action is now governed by the embrasive language of section 1430e, as indicated by the comments made heretofore when discussing the effect of the amendment of 1937. The demurrer to this count is sustained on the first ground.

The defendant has likewise demurred to the prayer for relief which seeks $50,000 damages. As all of the causes of action are governed by the provisions of section 1430e, the limitation of $15,000 must control. The demurrer to the prayer for relief is sustained.

One final word. In their briefs, both parties have taken the position that the damages which are sought are those to be assessed for Perlstein's death. It is conceivable that, so far as the first and third counts are concerned, the court might refuse to sustain the demurrer to these counts, if damages of an ante mortem source had been pleaded and urged.